Case No. 25-2301

**UNITED STATES COURT OF APPEALS**
**FOR THE NINTH CIRCUIT**

---

**ROAR SPIRITS, LLC, f/k/a EL BANDIDO YANKEE, LLC**

*Plaintiff and Appellant,*

v.

**SUTTER HOME WINERY, INC.,**

*Defendant and Respondent.*

---

On Appeal from The United States District Court,
Northern District of California, Case No. 4:23-cv-04809-HSG,
Hon. Haywood S. Gilliam, Jr.

---

# APPELLANT'S OPENING BRIEF

---

**WOLF, RIFKIN, SHAPIRO, SCHULMAN & RABKIN, LLP**
Robert A. Rivas (CA Bar No. 196744)
rrivas@wrslawyers.com
Paulo A. de Almeida (CA Bar No. 279168)
pdealmeida@wrslawyers.com
Eric A. Westlund (CA Bar No. 293403)
ewestlund@wrslawyers.com
Benjamin J. Mandel (CA Bar No. 342091)
bmandel@wrslawyers.com
11400 West Olympic Boulevard, 9th Floor
Los Angeles, California 90064-1582
Telephone: (310) 478-4100
Facsimile: (310) 479-1422

*Attorneys for Appellant, ROAR SPIRITS, LLC f/k/a EL BANDIDO YANKEE, LLC*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Fed. R. App. P. 26.1, Appellant ROAR SPIRITS, LLC f/k/a EL BANDIDO YANKEE, LLC states that it has no parent corporation, and no publicly held corporation owns 10% or more of its stock within the meaning of the rule.

DATED: June 23, 2025

WOLF, RIFKIN, SHAPIRO,
SCHULMAN & RABKIN, LLP

By: */s/ Paulo A. de Almeida*
Paulo A. de Almeida
Robert A. Rivas
Eric A. Westlund
Benjamin J. Mandel

Attorneys for Appellant, ROAR SPIRITS, LLC f/k/a EL BANDIDO YANKEE, LLC

# TABLE OF CONTENTS

**Page**


I. INTRODUCTION ........................................................................................ 10

II. JURISDICTIONAL STATEMENT ............................................................... 12

III. STATEMENT OF ISSUES PRESENTED ON APPEAL ................................ 13

IV. STATEMENT OF THE CASE ..................................................................... 13

A. Roar and its EL BANDIDO YANKEE Tequila ................................ 13

B. Sutter and its BANDIT Boxed Wine ................................................ 16

C. There are Numerous Other Bandit Marks for Alcoholic Beverages ........................................................................................... 18

D. New Survey Evidence Conclusively Shows No Likelihood of Confusion .......................................................................................... 20

V. LEGAL STANDARD AND STANDARD OF REVIEW ............................... 21

A. SUMMARY JUDGMENT IS GENERALLY DISFAVORED IN THE TRADEMARK ARENA ........................................................ 27

VI. ARGUMENT ............................................................................................ 30

A. There is a Genuine Issue of Fact Whether "EL BANDIDO YANKEE" and "BANDIT" are Similar or Dissimilar in Appearance, Sound, and Meaning ...................................................... 31

1. There is a Factual Issue Whether "YANKEE" or "EL BANDIDO" is Dominant ......................................................... 32

2. There is a Factual Issue as to Whether Consumers Would Take "El Bandido Yankee" "as it is" or Whether the Doctrine of Foreign Equivalents Should apply ........................ 35

3. Even Without Applying the Doctrine of Foreign Equivalents, There are Factual Issues Regarding the Dissimilarity of the Marks ...................................................... 38

B. There is a Factual Dispute as to Whether Sutter's Mark is Weak Due to Third-Party Use and Registration of BANDIT-Formative Marks ............................................................................... 39

C. There is a Factual Dispute as to the Degree of Care Exercised by Consumers, Given the High Cost of EL BANDIDO YANKEE and Low Cost of BANDIT ............................................... 45

D. There is a Factual Dispute as to Whether an Absence of Actual Confusion Weighs Against a Finding of a Likelihood of Confusion ....46

1. The Absence of Confusion During Three Years of Coexistence with Extensive Marketing is Probative of No Likelihood of Confusion ....47

2. The District Could Improperly Disregarded the *Sartore* Survey Showing No Likelihood of Confusion as "Not Relevant" ....50

E. Whether the Absence of Bad Faith Intent in Selecting the Mark is Probative of No Likelihood of Confusion ....57

F. Whether There is a Likelihood of Expansion, Which, if Absent, Weighs Against a Likelihood of Confusion ....58

G. Whether There is a Likelihood of Confusion, Balancing the Factors ....60

VII. CONCLUSION ....63

STATEMENT OF RELATED CASES ....64

CERTIFICATE OF COMPLIANCE FOR BRIEFS ....65

CERTIFICATE OF SERVICE ....66

# TABLE OF AUTHORITIES

**Page**

## CASES

*AMF Inc. v. Sleekcraft Boats*,
599 F.2d 341 (9th Cir. 1979) .................... passim

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986).................... 30

*Anheuser-Busch, Inc. v. Balducci Publications*,
28 F.3d 769 (8th Cir. 1994) .................... 22

*Anheuser-Busch, LLC v. Innvopak Sys. Pty Ltd.*,
115 USPQ2d 1816 (TTAB 2015).................... 51

*B&B Hardware, Inc. v. Hargis Indus., Inc.*,
575 U.S. 138 (2015).................... 23

*Balint v. Carson City*,
180 F.3d 1047 (9th Cir. 1999) .................... 29, 30

*Barbara's Bakery Inc. v. Landesman*,
82 USPQ2d 1283 (TTAB 2007).................... 48

*Bjs Restaurants, Inc.*,
TTAB Opposition No. 91241877, 2025 WL 698604 (TTAB Feb. 27, 2025) .................... 54

*C.V. v. Casa Azul Spirits, LLC*,
No. H-22-2972, 2023 WL 7284182 (S.D. Tex. 2023) .................... 56

*Calvin Klein Cosmetics Corp. v. Lenox Labs.*,
815 F.2d 500 (8th Cir. 1987) .................... 22

*Casa Tradicion, S.A. de C.V. v. Casa Azul Spirits, LLC*,
No. H-22-2972, 2024 WL 1622638 (S.D. Tex. 2024) .................... 56

*Central Soya Co., Inc. v. North American Plant Breeders*,
212 USPQ 37 (TTAB 1981) .................... 48

*Citigroup Inc. v. Cap. City Bank Grp., Inc.*,
94 USPQ2d 1645 (TTAB 2010).................... 49

*Combe Inc. v. Dr. August Wolff GmBH & Co. KG Arzneimittel*,
382 F.Supp.3d 429 (E.D. Va. 2019) .................... 52

*Combe Incorporated v. Dr. August Wolff GMBH & Co. KG Arzneimittel*,
851 F.App'x. 357, 2021 WL 1384750 (4th Cir. 2021) .................... 52

*Dreamwerks Prod. Group, Inc. v. SKG Studio*,
142 F.3d 1127 (9th Cir. 1998) ....................................................................38

*E & J Gallo v. Proximo Spirits, Inc.*,
No. CV–F–10–411 LJO JLT, 2012 WL 273076 (E.D. Cal. Jan. 30, 2012) ....................................................................50

*E. & J. Gallo Winery v. Proximo Spirits, Inc.*,
583 F.App'x 632 (9th Cir. 2014)....................................................................50

*Entrepreneur Media, Inc. v. Smith*,
279 F.3d 1135 (9th Cir. 2002) ....................................................................28

*Fisher v. Tucson Unified Sch. Dist.*,
652 F.3d 1131 (9th Cir. 2011) ....................................................................22

*Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt., Inc.*,
618 F.3d 1025 (9th Cir. 2010) .............................................................. passim

*Freecycle Sunnyvale v. Freecycle Network*,
626 F.3d 509 (9th Cir. 2010) ....................................................................22

*Frudden v. Pilling*,
877 F.3d 821 (9th Cir. 2017) ....................................................................29

*Gillette Canada Inc. v. Ranir Corp.*....................................................................56

*Gillette Canada Inc. v. Ranir Corp.*,
23 USPQ2d 1768, 1992 WL 215312 (TTAB June 24, 1992).......................48

*Golden West Fin. v. WMA Mortgage Servs., Inc.*,
No. C 02–5727 CRB, 2003 WL1343019 (N.D. Cal. Mar.13, 2003) ...........31

*GoTo.com, Inc. v. Walt Disney Co.*,
202 F.3d 1199 (9th Cir. 2000) ....................................................................31

*Grubhub Inc. v. Relish Labs LLC*,
80 F.4th 835 (7th Cir. 2023) ....................................................................50

*In re Aquamar, Inc.*,
115 USPQ2d 1122 (TTAB 2015).......................................................... 35, 37

*In Re Boyd Gaming Corp.*,
No. 97838771, 2025 WL 1638879 (TTAB May 14, 2025) ..........................44

*In re Chippendales USA, Inc.*,
622 F.3d 1346 (Fed. Cir. 2010) ....................................................................39

*In re E.I. DuPont DeNemours & Co.*,
177 USPQ 563 (CCPA 1973)....................................................................57

In re FabFitFun,
2018 TTAB LEXIS 297 (TTAB 2018) ......................................................44

*In re La Peregrina Ltd.*,
86 USPQ2d 1645 (TTAB 2008)....................................................................37

*In Re Metabeauty, Inc.*,
No. 97492557, 2025 WL 476734 (TTAB Jan. 28, 2025) ............................44

*In re Pan Tex Hotel Corp.*,
190 USPQ 109 (TTAB 1976)........................................................................35

*In Re Princeton Pi Holdings, LLC*,
No. 88962401, 2022 WL 1421553 (TTAB Apr. 15, 2022)..........................41

*In re Thomas*,
79 USPQ2d 1021 (TTAB 2006)....................................................................35

*Jack Wolfskin Ausrustung Fur Draussen GmbH & Co. KGAA v. New Millennium Sports, S.L.U.*,
797 F.3d 1363 (Fed. Cir. 2015) ....................................................................40

*JIPC Mgmt., Inc. v. Incredible Pizza Co.*,
No. CV-0804310-MMM (PLAx), 2008 WL 11336396 (C.D. Cal. Aug. 26, 2008) ..........................................................................................40

*JL Beverage Co., LLC v. Jim Beam Brands Co.*,
828 F.3d 1098 (9th Cir. 2016) ............................................................. 28, 30

*Juice Generation, Inc. v. GS Enterprises LLC*,
794 F.3d 1334 (Fed. Cir. 2015) ......................................................... passim

*Keebler Co. v. Murray Bakery Prods.*,
866 F.2d 1386 (Fed.Cir.1989) ......................................................................61

*Kellogg Co. v. Pack'em Enters.*,
951 F.2d 330 (Fed.Cir.1991) ........................................................................61

*Limited v. Macy's Merchandising Group Inc*,
No. 15-CV-3645 KMW, 2016 WL 4094913 (S.D. N.Y. 2016)....................55

*Marketquest Grp., Inc. v. BIC Corp.*,
862 F.3d 927 (9th Cir. 2017) ........................................................................22

*Metal Jeans, Inc. v. Metal Sport, Inc.*,
987 F.3d 1242 (9th Cir. 2021) ......................................................................21

*Network Automation, Inc. v. Advanced Sys. Concepts, Inc.*,
638 F.3d 1137 (9th Cir. 2011) ......................................................................23

*Newsguy, Inc. v. Yomtobian*,
No. C 04–0811 CRB, 2004 WL 2944051 (N.D. Cal. Dec. 20, 2004)..........31

*Nina Ricci S.A.R.L. v. E.T.F. Enterprises, Inc.*,
889 F.2d 1070 (Fed. Cir. 1989) ....................................................................49

*Olsen v. Idaho State Bd. of Medicine*,
363 F.3d 916 (9th Cir. 2004) ....................29

*One Indus., LLC v. Jim O'Neal Distrib., Inc.*,
578 F.3d 1154 (9th Cir. 2009) ....................29

*Palm Bay Imps., Inc. v. Veuve Clicquot Ponsardin Maison Fondee en 1772*,
396 F.3d 1369 (Fed. Cir. 2005) ....................35

*Parks LLC v. Tyson Foods, Inc.*,
863 F.3d 220 (3d Cir. 2017) ....................54

*Rearden LLC v. Rearden Com., Inc.*,
683 F.3d 1190 (9th Cir. 2012) ....................28

*Reed v. Lieurance*,
863 F.3d 1196 (9th Cir. 2017) ....................30

*Relish Labs LLC v. Grubhub Inc.*,
44 S. Ct. 2630 (2024)....................50

*Robert Kirkman, LLC*,
TTAB Opposition No. 91242007, 2020 WL 4365811 (TTAB July 22, 2020) ....................51

*Rocket Trademarks Pty Ltd. v. Phard S.p.A.*,
98 USPQ2d 1066 (TTAB 2011).................... 41, 43

*Sears Mortg. Corp. v. Ne. Sav. F.A.*,
24 USPQ2d 1227 (TTAB 1992)....................62

*Simo v. Union of Needletrades*,
322 F.3d 602 (9th Cir. 2003) ....................29

*Soc. Techs. LLC v. Apple Inc.*,
4 F.4th 811 (9th Cir. 2021) .................... 21, 29

*Spireon, Inc. v. Flex Ltd.*,
71 F.4th 1355 (Fed. Cir. 2023) .................... 42, 43

*Starbucks U.S. Brands, LLC and Starbuck Corp. v. Marshall S. Ruben*,
78 USPQ2d 1741 (TTAB 2006)....................51

*Swatch AG v. Beehive Wholesale, LLC*,
739 F.3d 150 (4th Cir. 2014) ....................22

*Thane Int'l, Inc. v. Trek Bicycle Corp.*,
305 F.3d 894 (9th Cir. 2002) ....................28

*Thornburg v. Gingles*,
478 U.S. 30 (1986)....................22

*Tuxedo Monopoly, Inc. v. Gen. Mills Fun Grp., Inc.*,
648 F.2d 1335 (CCPA 1981) ....................60

*Union Carbide Corp. v. Ever-Ready Inc.*,
531 F.2d 366 (7th Cir. 1976) .................................................................. 50, 51

*Variety Stores, Inc. v. Wal-Mart Stores, Inc.*,
888 F.3d 651 (4th Cir. 2018) ......................................................................34

*WIZKIDS/NECA, LLC v. TIII Ventures, LLC*,
No. 17-CV-2400 (RA), 2019 WL 1454666 (S.D. N.Y. 2019).......................56

*Yellow Cab Co. of Sacramento v. Yellow Cab of Elk Grove, Inc.*,
419 F.3d 925 (9th Cir. 2005) ......................................................................29

**STATUTES**

15 U.S.C. § 1071(b) ................................................................... 12, 22, 23

28 U.S.C. § 1291 ..............................................................................................12

**OTHER AUTHORITIES**

5 McCarthy on Trademarks and Unfair Competition § 32:174 (5th ed.) ... 51, 52, 55

Trademark Manual of Examining Procedure § 1207.01(b)(vi)(A) (May
2025) ..............................................................................................................36

**RULES**

9th Cir. R. 3-1 .................................................................................................12

Fed. R. App. P. 4(a)(1) .......................................................................................12

# I.

# INTRODUCTION

Appellant, ROAR SPIRITS, LLC ("Roar"), appeals from the grant of summary judgment by the United States District Court for the Northern District of California (the "District Court") to Appellee Sutter Home Winery, Inc.'s ("Sutter") in a trademark case.

In the District Court, Roar sought *de novo* review of a decision of the Trademark Trial and Appeal Board ("Board") sustaining Sutter's opposition to Roar's two trademark applications for EL BANDIDO YANKEE ("word mark") and EL BANDIDO YANKEE TEQUILA COMPANY BLANCO & Design ("design mark"), depicted here (together, the "EL BANDIDO YANKEE" marks):



Roar applied to register the EL BANDIDO YANKEE marks for tequila,[1] and the Board sustained Sutter's opposition based on a finding of a likelihood of confusion with Sutter's word mark BANDIT covering "alcoholic beverages except beers," which are in fact boxed wines.

The District Court granted summary judgment in favor of Sutter, finding a likelihood of confusion. Roar respectfully submits the District Court erred in resolving issues of material fact and misapplied the *Sleekcraft* factors in finding a likelihood of confusion.

In reality, **EL BANDIDO YANKEE** and **BANDIT** are highly dissimilar:




**Roar's EL BANDIDO YANKEE tequila**



**Sutter's BANDIT boxed wine**

Roar contended below that a sound application of the *Sleekcraft* factors,

[1] The applications cover "distilled blue agave liquor" and "Blue distilled agave tequilana weber liquor" in class 33, which are essentially tequila.

based on *de novo* review of the record before the Board and relevant new evidence submitted in the District Court, compels the conclusion that there is no likelihood of confusion between these marks. On appeal, Roar contends that the District Court erred in granting summary judgment because there are genuine disputes of material fact that bear on numerous factors in the *Sleekcraft* likelihood-of-confusion analysis—disputes that the District Court resolved prematurely on a summary judgment posture, rather than in its role as fact-finder at trial based on review of a fully developed evidentiary record. The likelihood-of-confusion test is fact-intensive and ill-suited to resolution in summary fashion, and the District Court's undue deference to the Board's factual findings deprived Roar of its statutory right to *de novo* review of the Board's erroneous decision.

## II.

## JURISDICTIONAL STATEMENT

The District Court had jurisdiction under 15 U.S.C. §§ 1071(b)(1) and (4) to review a decision of the Trademark Trial and Appeal Board. This Court has jurisdiction of this appeal from a final judgment under 28 U.S.C. § 1291. The District Court's order and judgment were entered February 18, 2025. 1-ER-2. The Notice of Appeal was filed on March 20, 2025. 2-ER-299. The Appeal is timely under Fed. R. App. P. 4(a)(1) and 9th Cir. R. 3-1.

## III.

## STATEMENT OF ISSUES PRESENTED ON APPEAL

Whether the District Court erred in granting summary judgment in favor of Sutter on a *de novo* appeal from a TTAB decision sustaining Sutter's opposition to Roar's trademark applications, where the record subject to the District Court's *de novo* review contained numerous factual disputes material to the likelihood of confusion test under *Sleekcraft*.

## IV.

## STATEMENT OF THE CASE

### A. Roar and its EL BANDIDO YANKEE Tequila

Launched in 2021, Appellant's EL BANDIDO YANKEE tequila was created by two former professional athletes, Jim Bob Morris, a former NFL player who played for the Green Bay Packers, and Chris Chelios, a former NHL player who played for the Chicago Blackhawks. 2-ER-45, ¶ 4. The name EL BANDIDO YANKEE is a reference to a line from the movie Butch Cassidy and the Sundance Kid in which a character in the film says "Some say it's the Bolivian Bandits, and some say it's the Bandidos Yankees." *Id.*

EL BANDIDO YANKEE is a tequila brand that is uniquely focused on sports. *Id.*, ¶ 5. With sports, "we would be able to instantly connect with consumers and get our product into tons of hands immediately. Everyone at a

sporting event wants to have fun, and we can help them do that," explained co-founder Jim Bob Morris in an article in *Forbes*. 2-ER-45–46, ¶ 5, Ex. B; 2-ER-56. Roar was pouring EL BANDIDO YANKEE tequila just outside the stadium at Super Bowl XVII and up the road at the Waste Management Phoenix Open, a PGA Tour event. 2-ER-58–59. EL BANDIDO YANKEE has partnered with the NFL, NBA, NHL, MLB, UFC, and NASCAR. *Id*.

In just three years, EL BANDIDO YANKEE has become a very popular tequila, with nearly 30,000 cases (with 6 bottles in each case) sold and revenues in the millions of dollars since 2021. 2-ER-46, ¶ 6. The business has grown rapidly, with distribution in 16 states and annual sales nearly doubling since 2021. *Id*. EL BANDIDO YANKEE has won awards, and there has been extensive media coverage, including numerous articles and interviews about the brand and its founders. *Id*., ¶ 6, Ex. C; 2-ER-61.

The EL BANDIDO YANKEE mark is comprised of a mixture of Spanish and English words. The District Court took judicial notice of English and Spanish dictionary definitions and translations for the words "EL" (which translates into "he" or "the" in English); "BANDIDO" (a Spanish word which translates into "bandit") and the English word "YANKEE" ("a person from a northern or northeastern state of the United States"). 1-ER-7. The District Court declined to take judicial notice of Google Translate evidence showing the entire phrase "EL

BANDIDO YANKEE" means "THE YANKEE BANDIT," citing concerns with Google Translate's verified accuracy. *Id.* **However, the District Court acknowledged "[Sutter] does not dispute that the English translation of "El Bandido Yankee" is "The Yankee Bandit."** 1-ER-8, n. 33. Thus, there is no dispute the full phrase "EL BANDIDO YANKEE" translated from Spanish into English means "THE YANKEE BANDIT."

Roar's fictional "EL BANDIDO YANKEE" character is prominently depicted on the tequila bottles as a stylized image of a masked figure wearing a traditional cowboy hat, as follows:







When applied to a Mexican tequila, "Yankee" is intended to be ironic. 2-ER-46, ¶ 7. Consumers would chuckle at the notion of a North American "Yankee" as the ambassador for a tequila, which is a traditionally Mexican spirit. *Id.* As such, they will perceive "YANKEE" as the dominant and most memorable portion of the

mark. *Id*. This is especially true where YANKEE is ironic and humorous when applied to a Mexican tequila. *Id.*

EL BANDIDO YANKEE tequila is sold in numerous large chain store retailers, such as, for example, BevMo, Total Wine and Jewel-Osco as well as by numerous independent, non-chain retail stores. 2-ER-46–47, ¶ 9. EL BANDIDO YANKEE tequilas are also sold in numerous restaurants and bars across the United States, including the world-renowned NOBU. *Id*. It is also sold in multiple sports arenas around the country. *Id*. Generally, the price range of EL BANDIDO YANKEE tequila is between approximately $39 and approximately $50 per 750 ml. bottle. *Id*.

## B. Sutter and its BANDIT Boxed Wine

Sutter's BANDIT mark is only used for boxed wine. 2-ER-47, ¶ 11, Ex. D; 2-ER-73 (Sutter's BANDIT website). Sutter markets the BANDIT wines in tetra-pak boxes to campers, hikers and outdoor enthusiasts. *Id.* (BANDIT wines box depicting mountain range, and including statements "GO EXPLORE," and "1% FOR THE PLANET," as well as a logo for "National Parks of America,

Yosemite."). Indeed, the home page of the Bandit Wines website depicts a backpacker with a BANDIT wine box in the packet of his backpack:



2-ER-79. Sutter does not have a BANDIT "character" on its boxes or advertising.

BANDIT wines are sold in Seven-Eleven type convenience stores, large drugstore chains such as CVS and Rite-Aid, and gas station-affiliated convenience stores, such as the Extra Mile convenience stores located at many Chevron gas stations. 2-ER-48, ¶ 13. BANDIT boxed wines are sold at low retail price ranges of $7-$10 per 1 liter box and $4-$5 per 500 ml box. *Id.*

Sutter's executive, Robert Torkelson, admitted during his deposition that Sutter has *only* used the BANDIT mark to sell wine. 1-ER-39. He further admitted Sutter does not have any Mexican trademark applications covering tequila or COLA approvals, which are required to produce and sell tequila in the United States. *Id.* Sutter clearly has no intention to expand BANDIT into tequila. *Id.*

Mr. Torkelson also admitted Sutter is not aware of *any* instances of consumer confusion between EL BANDIDO YANKEE and BANDIT. 1-ER-10,

31. The parties agree there has never been a single instance of consumer confusion. *Id.*; 2-ER-48, ¶ 14. This is not surprising because the marks are highly dissimilar in appearance, sound, and meaning, and no consumer would ever believe EL BANDIDO YANKEE tequila is associated with BANDIT wine, or vice versa. *Id*. When Roar came up with the name EL BANDIDO YANKEE, it was not aware of Sutter's BANDIT boxed wines. *Id*.

## C. <u>There are Numerous Other Bandit Marks for Alcoholic Beverages</u>

BANDIT is not a unique mark. In the District Court, Roar submitted evidence showing numerous other entities use the mark Bandit or equivalents such as "Bandolero" (meaning "bandit") for the sale of alcoholic beverages, including:

- Bandido de Amores (tequila), 2-ER-81
- Bandolero, 2-ER-83
- Goofy Bandit Espressotini, 2-ER-85
- Penguin Bay Blackberry Bandit (blackberry wine), 2-ER-87
- The Bandit – the BX Press Cidery (cider), 2-ER-89
- Bandit Gypsy Hill Brewing (pale ale), 2-ER-103
- Barrel Bandit (bourbon), 2-ER-107
- Westend The Barrel Bandit (wine), 2-ER-112
- Houghton The Bandit Shiraz and Cabernet (wine), 2-ER-118
- Apple Bandit (ciders), 2-ER-125

- Bandit Brewing (beers), 2-ER-127
- Time Bandit vodka, 2-ER-133
- Bandit's Rum, 2-ER-139
- Bandit's Traditional Moonshine, 2-ER-142
- Bandit's Coffee Moonshine, 2-ER-148
- FORAJIDO (mezcal), 2-ER-150

2-ER-48–51, ¶ 15, Exs. E-T. In addition, there are at least two other registrations for similar marks covering alcoholic beverages at the United States Patent and Trademark Office:

- **BANDOLERO** (meaning "Bandit"[2]), Reg. No. 1,803,376 covering "wines and spirits; namely, tequila" in International Class 33. 2-ER-211–222 (status and title copy of registration). This registration was not made of record before the Board and it is *new evidence*.
- **FORAJIDO** (meaning "Bandit"[3]), Reg. No. 6,162,478 covering "Alcoholic beverages, namely, distilled spirits" in International Class 33. *Id*.

[2] The English translation of "BANDOLERO" in the mark is "bandit," according to the registration.

[3] The English translation of "FORAJIDO" in the mark is "bandit", "outlaw" or "fugitive," according to the registration.

Such widespread use and registration shows BANDIT-formative marks—including Sutter's BANDIT—are weak and diluted in field of alcoholic beverages.

### D. New Survey Evidence Conclusively Shows No Likelihood of Confusion

In May of 2024, Roar engaged Dr. AnnaBelle Sartore to conduct a consumer survey measuring whether there could be a likelihood of confusion between EL BANDIDO YANKEE and BANDIT. 2-ER-223–225, Ex. 1; 2-ER-228. In the *Eveready* style survey, one hundred twelve (112) qualified participants who recently purchased (or were likely to soon purchase) tequila nationwide were asked a series of open-ended questions designed to test whether they would confuse EL BANDIDO YANKEE with Sutter's BANDIT mark. 2-ER-228. **The results showed *zero* instances of confusion.** *Id.* Dr. Sartore explained:

> Based upon data collected during execution of this pilot survey, no individual respondent expressed a belief that [Sutter] made or put out a tequila under the EL BANDIDO YANKEE word mark, that no individual respondent thought that the EL BANDIDO YANKEE was being made or put out with the authorization, approval or sponsorship of [Sutter], and that no individual respondent thought that EL BANDIDO YANKEE had a business affiliation or business connection with [Sutter]

*Id.* Although it was a relatively small "pilot" survey of 112 respondents, given there was no confusion (zero instances), there would be no reason to conduct a follow-up "full study":

> While these results are based on a pilot of only one hundred twelve (112) respondents, unless there is a particular alteration in the environment, it would be my expectation, given the above-described results, that results of a full study (i.e., 200 test cell interviews and 200 control cell interviews) would not be anticipated to vary significantly from that of the pilot.

*Id*. In other words, no further investigation was warranted because the survey results clearly showed no likelihood of confusion between EL BANDIDO YANKEE and BANDIT. Despite not engaging an expert to conduct an opposing survey, Sutter disputes Dr. Sartore's findings—creating a genuine issue of material fact concerning the likelihood of confusion.[4]

## V.

## LEGAL STANDARD AND STANDARD OF REVIEW

Summary judgment rulings are reviewed de novo. *See Soc. Techs. LLC v. Apple Inc.*, 4 F.4th 811, 816 (9th Cir. 2021); *Metal Jeans, Inc. v. Metal Sport, Inc.*, 987 F.3d 1242, 1244 (9th Cir. 2021); *Marketquest Grp., Inc. v. BIC Corp.*, 862

---

[4] Sutter engaged an expert witness, Dr. Jacquline Chorn, who submitted a rebuttal report "critiquing" the *Sartore* survey, principally contending *Eveready* was an inappropriate survey method and expressing her preference for the *Squirt* methodology. However, as explained further below, *Eveready* is the "gold standard" survey in trademark cases, and the *Eveready* methodology was appropriate. In any event, the District Court did not rely on Dr. Chorn's rebuttal report and it should not be given any consideration in this appeal. 1-ER-9.

F.3d 927, 931 (9th Cir. 2017); *Freecycle Sunnyvale v. Freecycle Network*, 626 F.3d 509, 514 (9th Cir. 2010).

This Court can also review the District Court's factual findings *de novo* when they are infected by misapplication of the law. *See Fisher v. Tucson Unified Sch. Dist.*, 652 F.3d 1131, 1136 (9th Cir. 2011) ("Rule 52(a) 'does not inhibit an appellate court's power to correct errors of law, including those that may infect a so-called mixed finding of law and fact, or a finding of fact that is predicated on a misunderstanding of the governing rule of law.'" (citing *Thornburg v. Gingles*, 478 U.S. 30, 79 (1986)); *Anheuser-Busch, Inc. v. Balducci Publications*, 28 F.3d 769, 773, 796-97 (8th Cir. 1994) ("Since we cannot separate the court's factual finding of confusion from its legal conclusions, we conduct a *de novo* review of the well-developed record before us.") (quoting *Calvin Klein Cosmetics Corp. v. Lenox Labs.,* 815 F.2d 500, 504 (8th Cir. 1987)). Here, the District Court's factual findings are based on, and intertwined with, its legal errors, further making *de novo* review necessary.

Roar had the right to admit any new evidence not presented to the USPTO that is admissible under the Federal Rules of Evidence and Civil Procedure. *Swatch AG v. Beehive Wholesale, LLC*, 739 F.3d 150, 155 (4th Cir. 2014); *see also* 15 U.S.C. § 1071(b)(3). When a party presents new evidence, the District Court must resolve the issue of registration *de novo* ***without deference to the TTAB***

***decision***. *See B&B Hardware, Inc. v. Hargis Indus., Inc.*, 575 U.S. 138, 144 (2015). In analyzing whether there is a likelihood of confusion, courts will apply eight non-exhaustive factors, known as the *Sleekcraft* factors: (1) the strength of the mark(s); (2) proximity or relatedness of the goods; (3) similarity of the marks; (4) evidence of actual confusion; (5) marketing channels; (6) degree of consumer care; (7) the defendants' intent; and (8) likelihood of expansion. *Network Automation, Inc. v. Advanced Sys. Concepts*, *Inc.*, 638 F.3d 1137, 1145 (9th Cir. 2011) (citing *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348–49 (9th Cir. 1979)).

On November 19, 2024, counsel for the parties appeared before the District Court for a Final Pretrial Conference under Rule 16. Sutter's summary judgment motion was pending at the time, and the District Court and parties engaged in extensive discussion concerning the likelihood-of-confusion analysis. During the discussion, the District Court described its own role in reviewing the Board decision under 15 U.S.C. § 1071(b) as "strange" and questioned the extent of *de novo* review available to Roar. 2-ER-294:8–24. After agreeing with the parties that the applicable standard required the District Court to "start over" (i.e., review without deference to the Board findings), 2-ER-295:5–7, the District Court referred to Roar's statutory right to review as "a second bite at the apple," 2-ER-279:15–16, and "[not] efficient from a societal perspective," 2-ER-294:22.

Although the District Court's order reflects detailed analysis of the record, its undue deference to the Board's decision led the District Court to the same erroneous result—finding a likelihood of confusion where the overwhelming weight of evidence (including new evidence *not* before the Board) shows none exists. In doing so, the District Court erroneously resolved myriad issues of material fact about which Road and Sutter vehemently disagree—and about which Roar is entitled to *de novo* review of its newly presented evidence, which included the following:

- A consumer survey demonstrating no likelihood of confusion, 2-ER-226–271;
- Deposition testimony from Sutter's executive, Robert Torkelson, in which he admits Sutter is not aware of any instances of consumer confusion, and the parties agree there have been no such instances of confusion; 1-ER-39;
- English and Spanish dictionary definitions and translations for the words "EL," "BANDIDO," and "YANKEE", 2-ER-155, 170, 182;
- Translation evidence showing the Spanish phrase "EL BANDIDO YANKEE" means "THE YANKEE BANDIT" in English, 2-ER-199;[5]

---

[5] The District Court declined to take judicial notice of this translation citing concerns with Google Translate's verified accuracy, but nevertheless

- Internet evidence showing widespread use of third-party BANDIT marks for alcoholic beverages, 2-ER-81–151; and
- Third party registration evidence, including one new registration the Board did not consider, namely, BANDOLERO (meaning "bandit"), 2-ER-211.

Upon reviewing the Board's decision *de novo* and the new evidence, the Court should have found there is no likelihood of confusion. At a minimum, there are numerous issues of fact which should have precluded summary judgment, including:

- Whether there is a likelihood of confusion;
- Whether the marks as a whole are highly dissimilar in appearance, sound, and meaning;
- Whether "YANKEE" is the dominant portion of the mark, given "BANDIDO" is weak due to third-party use and registration in the field of alcoholic beverages;
- Whether "YANKEE" would be perceived as a noun, not merely an adjective which "modifies" "BANDIDO," and therefore "YANKEE" should be assigned more weight than "EL BANDIDO";

---

acknowledged the parties do not dispute the English translation of "EL BANDIDO YANKEE" is "THE YANKEE BANDIT." 1-ER-8, n. 33.

- Whether the designs in Roar's composite (combined word and design) mark are also dominant and should be afforded more weight in the analysis, or whether they merely emphasize and reinforce the meaning of the portion "BANDIDO" as "bandit";
- Whether consumers will "stop and translate" "EL BANDIDO YANKEE" because the literal and direct translation is "THE YANKEE BANDIT" or whether they will "as it is," and therefore whether the doctrine of foreign equivalents should apply;
- Whether BANDIT is weak due to extensive third party use and registration of BANDIT-formative marks in the field of alcoholic beverages, or whether it has "moderate commercial strength";
- Whether Roar's new survey evidence (which the District Court disregarded as "not relevant") demonstrates there is no actual confusion, and whether this weighs against a finding of a likelihood of confusion, or is neutral;
- Whether the lack of actual confusion - despite years of coexistence in the marketplace with heavy advertising and consumer exposure to both marks – weighs against a finding of a likelihood of confusion, or is neutral;

- Whether consumers will exercise greater care when purchasing expensive tequila (which sells for between $39 and $50 per 750 ml. bottle) vs low cost, boxed wine (which sells for about $7 to $10 per 1 liter box, and about $4 to $5 per 500 ml. box), and whether this factor weighs in Roar's favor, or is at best neutral;
- Whether Roar's new evidence showing Roar's good faith intent in selecting its EL BANDIDO YANKEE mark weighs in favor of Roar, or is neutral;
- Whether Roar's new evidence showing no likelihood of expansion weighs in favor of Roar weighs in favor of Roar, or is neutral;
- Whether, in balancing the *Sleekcraft* factors the differences between the marks is are so great such that this key factor is dispositive of no likelihood of confusion; and how the *Sleekcraft* factors should be balanced here.

## A. <u>SUMMARY JUDGMENT IS GENERALLY DISFAVORED IN THE TRADEMARK ARENA</u>

Summary Judgment was wholly inappropriate at this stage, and should not have been granted for numerous reasons, starting with the principle that summary judgment is disfavored in the trademark arena.

Likelihood of confusion is an "intensely factual" question. *Rearden LLC v. Rearden Com., Inc.*, 683 F.3d 1190, 1202 (9th Cir. 2012). "***Because the determination [of likelihood of confusion] is based on a non-exhaustive, multi-factor, fact-intensive inquiry, we have cautioned against granting summary judgment in these cases***." *JL Beverage Co., LLC v. Jim Beam Brands Co.*, 828 F.3d 1098, 1105-06 (9th Cir. 2016) (emphasis added) (reversing summary judgment for defendant). This Court has repeatedly warned that summary judgment on this ground is "generally disfavored" given "the open-ended nature of this multi-prong inquiry," *Rearden*, 683 F.3d at 1210, and should be granted only "sparingly," *Thane Int'l, Inc. v. Trek Bicycle Corp.*, 305 F.3d 894, 901-02 (9th Cir. 2002) (reversing summary judgment); *see also Entrepreneur Media, Inc. v. Smith,* 279 F.3d 1135, 1140 (9th Cir. 2002); *Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt., Inc.*, 618 F.3d 1025, 1031 (9th Cir. 2010) citing *Entrepreneur Media,* 279 F.3d at 1140 ("This case is yet another example of the wisdom of the well-established principle that '[b]ecause of the intensely factual nature of trademark disputes, summary judgment is generally disfavored in the trademark arena' . . . . We are far from certain that consumers were likely to be confused as to the source of Victoria's Secret's pink tank top, but we are confident that the question is close enough that it should be answered as a matter of fact by a jury, not as a matter of law by a court."); *One Indus., LLC v. Jim O'Neal Distrib.*,

*Inc.*, 578 F.3d 1154, 1162 (9th Cir. 2009) (summary judgment is disfavored in trademark cases); *Yellow Cab Co. of Sacramento v. Yellow Cab of Elk Grove, Inc.*, 419 F.3d 925, 927 (9th Cir. 2005); *see also Soc. Techs. LLC*, 4 F.4th at 816 ("Because of the intensely factual nature of trademark disputes, summary judgment is generally disfavored in the trademark arena." (internal quotation marks and citation omitted)).

On review, the appellate court must determine, viewing the evidence in the light most favorable to the nonmoving party, whether there are any genuine issues of material fact and whether the District Court correctly applied the relevant substantive law. *See Soc. Techs. LLC*, 4 F.4th at 816; *Frudden v. Pilling*, 877 F.3d 821, 828 (9th Cir. 2017); *Olsen v. Idaho State Bd. of Medicine*, 363 F.3d 916, 922 (9th Cir. 2004). The court must not weigh the evidence or determine the truth of the matter but only determine whether there is a genuine issue for trial. *See Balint v. Carson City*, 180 F.3d 1047, 1054 (9th Cir. 1999).

Summary judgment is not proper if material factual issues exist for trial. *See Simo v. Union of Needletrades*, 322 F.3d 602, 610 (9th Cir. 2003). Summary judgment is improper if there are "any genuine issues of material fact"—facts which, "under the governing substantive law, could affect the outcome of the case." *Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt., Inc.*, 618 F.3d at 1031 (citations omitted). "A genuine issue of material fact exists when the

evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

Here there are disputed issues of fact for the finder of fact to resolve, as well as disputes regarding the inferences to be drawn from those facts and the weight to be given different *Sleekcraft* factors. Those disputes cannot be resolved at summary judgment. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Instead, for purposes of ruling on the summary judgment Motion, Lerner & Rowe's evidence "is to be believed, and all justifiable inferences are to be drawn in [appellant's] favor." *Id.*; *see also Reed v. Lieurance*, 863 F.3d 1196, 1204 (9th Cir. 2017) (same). The District Court's erroneous and explicitly disfavored grant of summary judgment in should therefore be reversed. *See JL Beverage Co., LLC v. Jim Beam Brands Co.*, 828 F.3d at 1105.

## VI.

## <u>ARGUMENT</u>

The District Court erred in resolving numerous genuine issues of fact, which is improper. *See Balint v. Carson City*, 180 F.3d at 1054 (9th Cir. 1999) (the court must not weigh the evidence or determine the truth of the matter but only determine whether there is a genuine issue for trial). These disputes of fact include at least the following as detailed below.

### A. <u>There is a Genuine Issue of Fact Whether "EL BANDIDO YANKEE" and "BANDIT" are Similar or Dissimilar in Appearance, Sound, and Meaning</u>

The *Sleekcraft* factor of the similarity (or dissimilarity) of the parties' marks is "the most crucial factor in determining the likelihood of confusion." *Newsguy, Inc. v. Yomtobian*, No. C 04–0811 CRB, 2004 WL 2944051, at *4 (N.D. Cal. Dec. 20, 2004) (Breyer, J.) (quoting *Golden West Fin. v. WMA Mortgage Servs., Inc.*, No. C 02–5727 CRB, 2003 WL1343019, at *4 (N.D. Cal. Mar.13, 2003) (Breyer, J.)); *see also GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1205 (9th Cir. 2000) (noting that "the similarity of the marks [ ] has always been considered a critical question in the likelihood of-confusion analysis").

Here, the marks "EL BANDIDO YANKEE" and "BANDIT" are not similar. More importantly, whether the marks are similar or dissimilar is an intensely factual question that should be determined by the fact finder after weighing the evidence. *See, e.g., Fortune Dynamic, Inc.*, 618 F.3d at 1031 (reversing summary judgment finding "a jury could reasonably conclude that the "similarity of marks" factor weighs in favor of [non-movant]").

On this question, there are *at least* genuine disputes as to (1) whether "YANKEE" or "EL BANDIDO" is dominant in creating the commercial impression in Roar's marks; (2) whether consumers would "stop and translate" EL

BANDIDO YANKEE into "THE YANKEE BANDIT," and therefore whether the doctrine of foreign equivalents should apply; and (3) even without applying the doctrine of foreign equivalents, whether the marks are so different in appearance, sound, and especially *meaning* such that confusion is not likely.

### 1. There is a Factual Issue Whether "YANKEE" or "EL BANDIDO" is Dominant

As part of the dissimilarity analysis, the District Court improperly resolved the issue of whether "YANKEE" or "BANDIDO" in Roar's marks is dominant in creating the commercial impression of "EL BANDIDO YANKEE."[6] 1-ER-27–29. Roar submitted evidence of third-party BANDIT-formative marks to constrict the "BANDIDO" portion and emphasize "YANKEE is dominant." 2-ER-46–51, ¶ 15. Roar also emphasized consumers would chuckle at the notion of a North American "Yankee" as the ambassador for a tequila, which is a traditionally Mexican spirit. 2-ER-46, ¶ 7. "YANKEE" is also the *first* portion of the mark after translation into "THE YANKEE BANDIT." "Yankee" is a noun, and not merely an "adjective" modifying "El Bandido." 2-ER-153, ¶ 4. Based on this evidence, consumers will perceive "YANKEE" as the dominant and most memorable portion of the marks.

---

[6] *Juice Generation, Inc. v. GS Enterprises LLC*, 794 F.3d 1334, 1340-1341 (Fed. Cir. 2015) (acknowledging "more weight should be given to the dominant part of the marks").

The District Court weighed the evidence and concluded "BANDIDO" is the dominant portion of Roar's marks. 1-ER-29–30. The District Court disregarded Roar's evidence of third-party marks absent "extent of use" evidence, but this evidence was not required as a matter of law. *See infra* Section VI.B. There are at least 16 third party uses of BANDIT-formative (or equivalent) marks for alcoholic beverages, and at least two (2) other registrations for similar marks at the USPTO. **In a crowded field of BANDIT-formative marks, consumers will look to the other elements—especially the distinctive "YANKEE"—to identify source.** That is especially true where, as here, Roar's marks include the additional terms "EL" and "YANKEE" and other wording and design elements in its composite mark. Moreover, after the mark is translated into "THE YANKEE BANDIT," the portion "YANKEE" is *first* and therefore dominant in creating the commercial impression.[7]

The District Court also found YANKEE "functions as an adjective" because it "describes an attribute of the 'Bandido.'" 1-ER-27:11–12. But there is no

---

[7] The District Court rejected this argument because it relies on the doctrine of foreign equivalents, which the District Court declined to apply. 1-ER-29, n. 11. In this appeal, Roar contends the doctrine of foreign equivalents *should* have been applied. *See infra*, Section VI.A.2. Even if it is not applied, consumers would still understand "El Bandido Yankee" means "The Yankee Bandit" and this meaning must be considered when comparing the marks for dissimilarity. *See infra*, Section VI.A.3.

evidence suggesting consumers would actually *perceive* "YANKEE" as merely an "adjective" modifying "EL BANDIDO" as opposed to a noun. There is *at least* a factual issue as to whether consumers would perceive "YANKEE" to be a primarily a noun or merely an adjective, and how much weight should be afforded to "YANKEE."

Based on the foregoing evidence, "BANDIDO" should have been constricted as weak and "YANKEE" should have been given more weight. At a minimum, the District Court erred in resolving the factual dispute over whether "BANDIDO" or "YANKEE" is dominant. **The District Court should have *identified* the dispute regarding the dominant portion of the mark and denied summary judgment, leaving the issue for trial**. *See Variety Stores, Inc. v. Wal-Mart Stores, Inc.*, 888 F.3d 651 (4th Cir. 2018) ("reasonable minds may differ" on whether the marks are similar and which portion is dominant and should be given "greater weight"; summary judgment denied).

### 2. There is a Factual Issue as to Whether Consumers Would Take "El Bandido Yankee" "as it is" or Whether the Doctrine of Foreign Equivalents Should apply

Roar submitted evidence of dictionary definitions in support of its position that the doctrine of false equivalents[8] should apply. 2-ER-153. Sutter argued the doctrine of foreign equivalents does not apply when a mark is a combination of foreign and English words. *See* 1-ER-24–25.

The District Court agreed with Sutter and found the doctrine of foreign equivalents does not apply because there is no evidence regarding the "portion of American consumers [] familiar with [Spanish]" or "whether this portion [of consumers] is an 'appreciable segment of American consumers'"; and "[c]onsequently, there is no record evidence suggesting that an ordinary American

---

[8] Under the doctrine of foreign equivalents, foreign words from common languages are translated into English to determine the similarity of connotation with English word marks. *Palm Bay Imps., Inc. v. Veuve Clicquot Ponsardin Maison Fondee en 1772*, 396 F.3d 1369, 1377 (Fed. Cir. 2005). The doctrine is applied when it is likely that "the ordinary American purchaser would 'stop and translate [the word] into its English equivalent.'" *Id*. (quoting *In re Pan Tex Hotel Corp.*, 190 USPQ 109, 110 (TTAB 1976)); *see also In re Aquamar, Inc.*, 115 USPQ2d 1122, 1127 (TTAB 2015); *In re Thomas*, 79 USPQ2d 1021, 1024 (TTAB 2006). If the translation evidence shows that the English translation is unambiguously literal and direct, with no other relevant connotations or variations in meaning, the doctrine has generally been applied. *See In re Aquamar, Inc.*, 115 USPQ2d at 1126-28 (applying foreign equivalents doctrine after finding that Spanish is a common language in the U.S. and that ordinary purchasers would stop and translate mark MARAZUL into English based on evidence showing "mar azul" means "blue sea").

consumer would "stop and translate" [EL BANDIDO YANKEE] from Spanish to English." 1-ER-25–26. Thus, the District Court found consumers "would perceive the mark as it is." 1-ER-26:20.

Roar acknowledges "[t]he Board has yet to apply the doctrine in a published decision where the wording in one or more of the marks being compared consists of a combination of English and foreign-language words or terms." Trademark Manual of Examining Procedure (TMEP) § 1207.01(b)(vi)(A) (May 2025).[9] But the USPTO has not ruled out extending application of the doctrine to marks involving mixed English and foreign wording in the appropriate situation:

> In such a case, the issue would likely remain whether the ordinary American purchaser would stop and translate these combined-language marks. The sufficiency of the translation evidence, the nature of the combined foreign and English wording (i.e., whether the wording is arbitrary, suggestive, generic, etc.), and any other relevant facts and evidence should be considered in these cases.

*Id*.

Here there are good reasons why the doctrine of foreign equivalents should apply. _*First*_, as noted above literal and direct translation of EL BANDIDO YANKEE is "THE YANKEE BANDIT." The evidence of record supports this

[9] available at https://tmep.uspto.gov/RDMS/TMEP/current.

translation and *the parties agree on it*.[10] Thus, the "sufficiency of the translation evidence" supports a finding that consumers would "stop and translate" the mark. *See* TMEP § 1207.01(b)(vi)(A).

*Second*, there is no other intelligible translation of "EL BANDIDO YANKEE." For example, consumers will not perceive the mark as "*the bandit yankee*," which would not make any sense - even in English. Thus, the absence of any other connotations or variations in meaning supports a finding that consumers would "stop and translate" the mark such that the doctrine should be applied. *See In re Aquamar, Inc.*, 115 USPQ2d at 1126-28.

*Third*, there is no question Spanish is a common language in the United States, and the Board has routinely applied the doctrine of foreign equivalents to Spanish language marks. *Id.*; *see also In re La Peregrina Ltd.*, 86 USPQ2d 1645, 1648 (TTAB 2008) ("there is no question that Spanish is a common, modern language"). It is not controversial that Spanish is common language in the United States, and the District Court should not have declined to apply the doctrine of foreign equivalents on this basis.

In view of the literal and direct translation, the absence of any other connotations, and Spanish is a commonly spoken language in the United States, it

---

[10] The District Court acknowledged that "[Sutter] does not dispute that the English translation of "El Bandido Yankee" is "The Yankee Bandit." 1-ER-8, n. 33.

is likely that ordinary American purchasing consumers will "stop and translate" "EL BANDIDO YANKEE" into "THE YANKEE BANDIT." Therefore, the doctrine of foreign equivalents should apply, and the marks should be compared as "BANDIT" and "THE YANKEE BANDIT" after translation.

At a minimum, there is at least a genuine dispute as to whether everyday consumers would "stop and translate" the mark, and therefore whether the doctrine of foreign equivalents should apply. These factual questions are not appropriate for resolution on summary judgment.

### 3. Even Without Applying the Doctrine of Foreign Equivalents, There are Factual Issues Regarding the Dissimilarity of the Marks

Even without applying the doctrine of foreign equivalents, the District Court still should have assessed the *meaning* of the marks, as well as other differences in appearance and sound. *Dreamwerks Prod. Group, Inc. v. SKG Studio*, 142 F.3d 1127, 1131 (9th Cir. 1998) ("The court assesses the similarity of the marks in terms of their sight, sound, and meaning.").

It is impossible to compare the marks without considering the *meaning* of Roar's mark, which is "THE YANKEE BANDIT." **Given the undisputed translation, the District Court should have concluded Roar's mark means "THE YANKEE BANDIT," which is highly dissimilar from "BANDIT."** The

appearance of the mark "EL BANDIDO YANKEE" partially in the Spanish language further emphasizes the differences in appearance and sound, weighing heavily against a finding of similarity. At a minimum, there is a genuine dispute as to whether the marks are similar or dissimilar in appearance, sound, and especially in *meaning,* which should be resolved by the fact finder and not on summary judgment.

### B. <u>There is a Factual Dispute as to Whether Sutter's Mark is Weak Due to Third-Party Use and Registration of BANDIT-Formative Marks</u>

Another key *Sleekcraft* factor assesses the strength of the marks.[11] Sutter provided evidence of the commercial strength of BANDIT, and Roar countered with evidence of the commercial weakness of the mark based on third-party use and registration of BANDIT-formative marks for alcoholic beverages. The District Court disregarded most of Roar's third-party marks evidence and found BANDIT is "moderately strong commercially." 1-ER-18.

---

[11] In determining the strength of a mark, courts consider its inherent strength, based on the nature of the mark itself, and, if there is evidence in the record of marketplace recognition of the mark, its commercial strength. *See In re Chippendales USA, Inc.*, 622 F.3d 1346, 1353-54 (Fed. Cir. 2010) ("A mark's strength is measured both by its conceptual strength (distinctiveness) and its marketplace strength (secondary meaning)"). In this appeal, Roar does not take issue with the Board's finding that BANDIT is arbitrary and "conceptually strong." 1-ER-13, 18. However, the mark is commercially weak and entitled to a narrow scope of protection.

The District Court did not properly apply the substantive law of third-party marks evidence. The Federal Circuit has held that the existence of numerous third-party uses is probative regarding the commercial strength or lack thereof of a mark at issue, even where the specific extent and impact of the third-party usage has not been established. *See Jack Wolfskin Ausrustung Fur Draussen GmbH & Co. KGAA v. New Millennium Sports, S.L.U.*, 797 F.3d 1363 (Fed. Cir. 2015); *Juice Generation, Inc. v. GS Enters. LLC*, 794 F.3d 1334, 115 USPQ2d 1671, 1674 (Fed. Cir. 2015).

The District Court disregarded ten out of sixteen of the third-party uses of BANDIT-formative marks, improperly requiring "extent of use" evidence.[12] The District Court relied on cases before the 2015 decisions in *Jack Wolfskin* and *Juice Generation* when extent of use evidence was required.[13] *See* 1-ER-16–17. But after *Jack Wolfskin* and *Juice Generation,* Roar's evidence of third-party use of BANDIT-formative marks "is 'powerful on its face,' ***even where the specific***

[12] *See* 1-ER-16:19–22 ("[a]t best, [Roar] has offered six third-party uses of "BANDIT-formative (or equivalent) marks for alcoholic beverages . . . but [Roar] has not introduced any evidence 'reflect[ing] the extent' of these third-party uses.").

[13] For example, the District Court relied on *JIPC Mgmt., Inc. v. Incredible Pizza Co.*, No. CV-0804310-MMM (PLAx), 2008 WL 11336396, at *15 (C.D. Cal. Aug. 26, 2008) ("Absent evidence of the location, extent, and length of competitors' use of similar marks, the court is unable to evaluate whether JIPC indeed uses its mark in a crowded field").

***extent and impact of the usage has not been established***." *See Jack Wolfskin,* 797 F.3d 1363 at 1374 (emphasis added).

Nor should the District Court have taken issue with "whether these third-party products are sold to customers in the United States or whether the products are manufactured or sold by foreign or domestic companies." 1-ER-15. Roar does not have a burden of proving the third-party products are "sold to customers in the United States" under *Juice Generation* and *Jack Wolfskin*.

Even if some of the third-party products are not sold in the United States (which has not been proven), ***U.S. consumers are still exposed to these third-party BANDIT marks through Internet advertising***—for example, when they search for BANDIT-formative brands online. Internet printouts "on their face, show that the public may have been exposed to those internet websites and therefore may be aware of the advertisements contained therein." *Rocket Trademarks Pty Ltd. v. Phard S.p.A.*, 98 USPQ2d 1066, 1072 (TTAB 2011); *see also In Re Princeton Pi Holdings, LLC*, No. 88962401, 2022 WL 1421553, at *7 (TTAB Apr. 15, 2022) ("[w]hile Applicant has not presented specific evidence concerning the extent and impact of these uses, it nevertheless presented evidence of these marks being used on the internet to advertise restaurant and/or bar services."). Thus, the District Court erred discounting the third-party marks without "extent of use" evidence. All 16 third-party uses should have been considered.

The District Court also erred in disregarding two (2) third-party registrations for BANDOLERO and FORAJIDO[14] for lack of extent of use evidence. 1-ER-17. The District Court acknowledged BANDOLERO "appears to be used in the United States" based on Internet evidence, *id.*, but disregarded the registration because "[Roar] has not provided any evidence regarding *the extent* to which the BANDOLERO mark is used." *Id.* (emphasis added). Similarly for FORAJIDO, the District Court acknowledged "[Roar] provided the Court with a link to the FORAJIDO website" but disregarded the registration because "the Court is unable to determine whether the FORAJIDO mark is actually used in the U.S., or whether the product is manufactured or sold in the United States." *Id.*

Again the District Court relied on cases prior to *Juice Generation* and *Jack Wolfskin* and its progeny. The Federal Circuit recently clarified in *Spireon, Inc. v. Flex Ltd.*, 71 F.4th 1355 (Fed. Cir. 2023) that the *plaintiff* has the burden of proving any purported non-use of identical third-party registered marks for identical goods in assessing the commercial strength of mark. *Id.* at 1365. Although the holding only appears to apply to third-party registrations for identical marks for identical goods, the Federal Circuit reasoned more broadly that applicants should not have the burden of proving third-party marks are in use:

---

[14] "Forajido" means "bandit."

> While the applicant has a burden of producing evidence of relevant registrations, it may be that where the applicant has introduced evidence of third-party registrations, the burden should rest on the opposer to establish non-use rather than on applicants to establish use of those third-party registrations. **In other words, absent proof of non-use, use could be assumed**. Nonetheless, in prior cases, we and our predecessor court appear to have assumed, without explicitly stating, that in connection with the analysis of commercial strength, the burden rested on the applicant to establish that prior marks were actually in use.

*Id*. Even assuming, after *Spireon*, an applicant still has at least an initial burden of showing registered marks are "in use," Roar clearly met that burden when it submitted website evidence of BANDOLERO for sale and FORAJIDO at least advertised in the United States. *See Rocket Trademarks Pty Ltd. v. Phard S.p.A.*, 98 USPQ2d at 1072 (consumers may be exposed to marks through Internet advertising). Roar was only required to introduce evidence showing the marks were "in use," and no "extent of use" evidence was required. Thus, absent clear evidence of nonuse of BANDOLERO and FORAJIDO in the United States, the District Court should have accepted Roar's evidence showing the marks are "in use," without requiring "extent of use" evidence.

Given BANDOLERO is in use in the United States and the District Court found this mark is similar to BANDIT, *see* 1-ER-17, it was error to disregard this registration. As to FORAIDO, the District Court found "the word "forajido" bears no similarity in sound to the word "bandit." *Id*. However, "forajido" translates

directly into "bandit" and consumers will perceive these marks as having the same meaning. To the extent reasonable minds might differ on the translation of "forajido" and the weight to be assigned to this registration, that is an issue of fact precluding summary judgment. Thus, the BANDOLERO and FORAJIDO registrations should have been considered—along with the 16 third-party uses—in assessing the weakness of the BANDIT mark.

Roar's evidence of sixteen third-party uses and two (2) registrations is consistent with other cases finding commercial weakness. *See In re FabFitFun*, 2018 TTAB LEXIS 297, at *15 (TTAB 2018) (ten third-party use examples of "SMOKIN' HOT formatives," along with a dictionary definition, deemed evidence that the mark was "somewhat weak"); *Jack Wolfskin*, 797 F.3d 1363 (at least fourteen relevant third party uses or registrations of record); *In Re Boyd Gaming Corp.*, No. 97838771, 2025 WL 1638879, at *5-6 (TTAB May 14, 2025) [not precedential] (nine third-party uses and nine third-party registrations sufficient to show weakness); *In Re Metabeauty, Inc.*, No. 97492557, 2025 WL 476734, at *6 (TTAB Jan. 28, 2025) [not precedential] (ten third-party registrations sufficient to show weakness).

The evidence shows consumers are accustomed to encountering BANDIT-formative marks for alcoholic beverages and will distinguish source based on even minute differences between them. **Accordingly, the District Court should have**

**found BANDIT is "weak" or at best "slightly weak" and therefore entitled to a narrower scope of protection, which weighs against a finding of a likelihood of confusion.** "The weaker [a registrant's] mark, the closer an applicant's mark can come without causing a likelihood of confusion and thereby invading what amounts to its comparatively narrower range of protection." *Juice Generation, Inc.*, 794 F.3d at 1338.

At a minimum, the third-party marks evidence raises an issue of fact that should not have been resolved on summary judgment. *See, e.g., Fortune Dynamic, Inc.*, 618 F.3d at 1031 (reversing summary judgment, finding "the relative commercial strength of the DELICIOUS mark [is] a question for the jury.").

## C. <u>There is a Factual Dispute as to the Degree of Care Exercised by Consumers, Given the High Cost of EL BANDIDO YANKEE and Low Cost of BANDIT</u>

In assessing the *Sleekcraft* factor of the degree of care exercised by consumers when purchasing the goods, the District Court erred in resolving a dispute of fact as to whether the different price points favored likelihood of confusion, which is a question of fact to be decided at trial. *Fortune Dynamic, Inc.*, 618 F.3d at 1031 (reversing summary judgment finding genuine issue of material fact as to sophistication of purchasers: "Whoever's right, the difficulty of trying to determine with any degree of confidence the level of sophistication of

young women shopping at Victoria's Secret only confirms the need for this case to be heard by a jury.").

Roar submitted evidence that its tequila has a much higher price point ($39 and $50 per 750 ml. bottle) than Sutter's boxed wine ($7 to $10 per 1 liter box, and in the range of $4 to $5 per 500 ml. box). 2-ER-46–47, ¶ 9. Consumers will exercise more care in purchasing Roar's high quality, imported tequilas, which are more expensive. "[W]hen the goods are expensive, the buyer can be expected to exercise greater care in his purchases . . . ." *Sleekcraft,* 599 F.2d at 353. The evidence of different pricing weighs *against* a finding of a likelihood of confusion, or is at least in genuine dispute.

## D. <u>There is a Factual Dispute as to Whether an Absence of Actual Confusion Weighs Against a Finding of a Likelihood of Confusion</u>

The District Court erred in finding that absence of a lack of evidence of actual confusion is not probative of no likelihood of confusion, finding this factor to be "neutral." 1-ER-35. First, the District Court erred in disregarding evidence of three years of heavy marketing of "El Bandido Yankee" without any instances of confusion. This period of time—given the revenues and advertising expenditures—is appreciable and should be considered at trial. Second, Roar submitted competent survey evidence (the *Sartore* survey) which the District Court distinguished as "not relevant" because it looked at actual market conditions and

the specific goods at issue, not the goods as shown in the application and registration. The District Court erred in disregarding the *Eveready* survey, which is the "gold standard" and readily accepted in TTAB oppositions.

**1. The Absence of Confusion During Three Years of Coexistence with Extensive Marketing is Probative of No Likelihood of Confusion**

First, the District Court found the absence of confusion during three years of coexistence with extensive marketing was based on "conclusory statements and attorney argument." 1-ER-32. However, the District Court had testimony that directly belies this finding. Roar's CFO, Eric Lanz, testified about extensive marketing of EL BANDIDO YANKEE during the last three years, including evidence of brand exposure at Super Bowl XVII and other major sports events; partnerships with NFL, NBA, NHL, MLB, UFC, and NASCAR; nearly 30,000 cases (with 6 bottles in each case) of tequila sold and revenues in the millions of dollars since 2021; awards and extensive media coverage, including numerous articles (such as in *Forbes*) and interviews about the brand and its founders. 2-ER-45–46, ¶¶ 4-6.

Against the weight of the evidence, the District Court found, "Plaintiff has not introduced any evidence showing there was a 'significant opportunity for actual confusion to have occurred.'" 1-ER-32:2–3. This finding was contrary to

the significant evidence of the extent and duration of Roar's use of its mark. That evidence included highly public marketing at major sporting events, awards and media coverage, extensive sales, and rapid growth in brand exposure over a period of three years—all in a purportedly overlapping market. This evidence clearly supported Roar's argument that the lack of actual confusion despite ample opportunity, tipping this *Sleekcraft* factor in its favor.

The TTAB and courts have previously found that coexistence without confusion for an appreciable period of time can tip the balance of this factor in the defendant's favor. *See Gillette Canada Inc. v. Ranir Corp.*, 23 USPQ2d 1768, 1992 WL 215312, at * 6 (TTAB June 24, 1992) ("the absence of any reported instances of actual confusion would be meaningful only if the record indicated appreciable and continuous use by applicant of its mark for a significant period of time in the same markets as those served by opposer under its marks," finding "Applicant, in this case, has failed to present any evidence of the extent and duration of the use of its mark."); *Barbara's Bakery Inc. v. Landesman,* 82 USPQ2d 1283, 1287 (TTAB 2007) (the probative value of the absence of actual confusion depends upon there being a significant opportunity for actual confusion to have occurred); *Central Soya Co., Inc. v. North American Plant Breeders,* 212 USPQ 37, 48 (TTAB 1981) ("actual confusion is obviously the best evidence of a likelihood of confusion, and the absence of actual confusion over a reasonable

period of time might well suggest that the likelihood of confusion is only a remote possibility with little probability of occurring”).

*Giant Food, Inc. v. Nation's Foodservice, Inc.*, 710 F.2d 1565, 218 USPQ 390, 395-396 (Fed. Cir. 1983) (observing that the lack of actual confusion made this factor weigh in applicant's favor); *Citigroup Inc. v. Cap. City Bank Grp., Inc.*, 94 USPQ2d 1645 (TTAB 2010) (finding “there has been a reasonable opportunity for confusion to have occurred and that the lack of any reported instances of confusion weighs against finding that there is a likelihood of confusion.”); *Nina Ricci S.A.R.L. v. E.T.F. Enterprises, Inc.,* 889 F.2d 1070, 1073-1074 (Fed. Cir. 1989) (the absence of any reported instances of actual confusion was not probative because the record failed to establish that there was a reasonable opportunity for confusion to have occur).

Moreover, the parties *agree* there have been no instances of actual confusion. Given the ample evidence of the extent and duration of Roar's use of its mark, the District Court should have found the lack of actual confusion is probative and this *Sleekcraft* factor tips in Roar's favor. At a minimum, the District Court should have found there was least a genuine dispute as to whether the absence of actual confusion supports a finding of no likelihood of confusion.

### 2. The District Could Improperly Disregarded the *Sartore* Survey Showing No Likelihood of Confusion as "Not Relevant"

The District Court also erred in declining to consider the *Sartore* Survey, finding it "not relevant" to the likelihood of confusion analysis "because it does not engage with the relevant legal issue: the likelihood of confusion between the marks as they are presented in the BANDIT Registration and the EL BANDIDO YANKEE Applications." 1-ER-33:9–11. This overlooks the point of the *Eveready* methodology, which is to assess a likelihood of confusion by presenting survey participants with *only* the defendant's mark—not the plaintiff's mark or its goods.

*Eveready* is a type of trademark survey methodology first approved by the Seventh Circuit in *Union Carbide Corp. v. Ever-Ready Inc.*, 531 F.2d 366 (7th Cir. 1976). *Eveready* is the gold standard for surveys in trademark cases. *See*, *e.g.*, *E & J Gallo v. Proximo Spirits, Inc.*, No. CV–F–10–411 LJO JLT, 2012 WL 273076, at *17 (E.D. Cal. Jan. 30, 2012), aff'd sub nom. *E. & J. Gallo Winery v. Proximo Spirits, Inc.*, 583 F.App'x 632 (9th Cir. 2014) (finding no likelihood of confusion and finding Eveready survey "highly probative" of an absence of likely confusion); *Grubhub Inc. v. Relish Labs LLC*, 80 F.4th 835, 853 (7th Cir. 2023), cert. denied, 144 S. Ct. 2630 (2024) (*Eveready* survey by junior user supported decision that there was not a strong case of reverse confusion).

An *Eveready* style survey is a reliable format that the TTAB accepts in oppositions. *Robert Kirkman, LLC,* TTAB Opposition No. 91242007, 2020 WL 4365811 (TTAB July 22, 2020); *Anheuser-Busch, LLC v. Innvopak Sys. Pty Ltd.*, 115 USPQ2d 1816, 1829 (TTAB 2015) (An Eveready-type survey is a "widely used and well-accepted format for likelihood of confusion surveys."); *Starbucks U.S. Brands, LLC and Starbuck Corp. v. Marshall S. Ruben*, 78 USPQ2d 1741, 1753 (TTAB 2006) ("[G]iven the way in which this survey format carefully follows the Ever-Ready likelihood of confusion survey format, we find that it is reliable and therefore of probative value on the issue of likelihood of confusion herein.").

In the typical Eveready survey, respondents are shown the junior user's mark in connection with the junior user's applied for services and are asked open-ended questions about the source of the junior user's services. 5 McCarthy on Trademarks and Unfair Competition § 32:174 (5th ed.). For example, in *Union Carbide Corp. v. Ever-Ready. Inc.*, the survey asked: "Who do you think puts out the lamp shown here? [showing a picture of defendant's EVER-READY lamp and mark], and "What makes you think so?" *Union Carbide Corp.*, 531 F.2d at 385.

Unlike the *Squirt* methodology, which "does not assume that the respondent is familiar with the senior mark" and therefore the survey respondent is presented with "both of the conflicting marks," 5 McCarthy on Trademarks and Unfair

Competition § 32:174.50 (5th ed.), **in an *Eveready* survey respondent is presented with *only* the junior mark**. *Id*. § 32:174. The Eveready survey methodology "does not inform survey respondents what the senior mark is, but assumes that they are aware of the mark from their prior experience." *Id*.

"In infringement litigation, the mark to be shown in an Eveready survey should be the accused mark as it appears to shoppers in the marketplace, either online or in brick-and-mortar stores." *Id*. "But if the contest involves solely the issue of registration (as in T.T.A.B. proceedings) then the mark to be shown in an Eveready survey should be the accused mark as it appears in the challenged application or registration." *Id.*; *Combe Inc. v. Dr. August Wolff GmBH & Co. KG Arzneimittel*, 382 F.Supp.3d 429, 460, n.29 (E.D. Va. 2019), aff'd 851 F.App'x. 357, 2021 WL 1384750 (4th Cir. 2021) (On review of the T.T.A.B. decision of an opposition, the court looks only at the mark and goods and services as shown the application. This meant that it was proper for an *Eveready* confusion survey to show the mark in plain, block letters as it appeared in the application, not as it appeared in the marketplace along with colors, logos and trade dress.).

That is exactly what consumers were shown in the Dr. Sartore's survey: the "EL BANDIDO YANKEE" mark in plain, block letters as it appeared in the application. 2-ER-226. And as in any *Eveready* survey, Dr. Sartore did not show the parties' goods placed side by side or even show participants Sutter's BANDIT

mark (i.e., like a *Squirt* survey). That is the point of the *Eveready* style survey: to test whether consumers would recall the plaintiff's mark when encountering the *defendant's* mark *without* being shown the plaintiff's mark, and regardless of the nature of the goods. The plaintiff's mark and goods as recited in the registration are therefore *irrelevant* for purposes of an *Eveready* survey. **It was error for the District Court to require a comparison of <u>both</u> marks and the respective goods, which is <u>never</u> done in an Eveready survey**.

Nor was it appropriate for the District Court to criticize the survey because it identified Roar's goods (tequila). *See* 1-ER-33:17–21 ("Dr. Sartore's survey, however, tests the likelihood of confusion between the [marks] as they are used *in the marketplace* . . . [S]urvey participants were asked questions that focused specifically on tequila, even though [Sutter's] BANDIT Registration broadly applies to alcoholic beverages except beers.").

Again, the District Court overlooks the entire point of the *Eveready* survey, which is to look ***<u>only at the mark and goods as shown the application</u>***, namely, "El Bandido Yankee" as used for tequila. *See* 5 McCarthy on Trademarks and Unfair Competition § 32:174.50 (5th ed.) (in a TTAB opposition, the mark to be shown in an *Eveready* survey should be the accused mark as it appears in the challenged application). The fact that consumers were informed that Roar's product is "tequila" is *<u>required</u>* for a proper *Eveready* survey, and the District

Court's suggestion consumers should not have been shown Roar's mark used for *tequila* would have defeated the purpose of the *Eveready* methodology.

Last, the District Court inconsistently concluded the BANDIT mark is "moderately strong commercially," 1-ER-18:19, while questioning Dr. Sartore's use of an *Eveready* survey where Roar contends the BANDIT mark is "weak," 1-ER-34:18. The District Court thus found Sutter's Mark is "strong" for purposes of assessing the "strength" *Sleekcraft* factor while inconsistently finding *Eveready* survey would be inappropriate if BANDIT is weak.

But if the BANDIT mark is indeed strong (as the court ultimately found), then an *Eveready* survey (testing consumers' recall memory of Sutter's purportedly "strong" mark) would have been expected to show consumer confusion, if the marks were similar. *See Parks LLC v. Tyson Foods, Inc.*, 863 F.3d 220, 233 (3d Cir. 2017) (*Eveready* survey appropriate in cases involving commercially strong marks).

The District Court's finding that BANDIT is "moderately strong commercially" thus *supports* the relevance of Dr. Sartore's *Eveready* survey. It would have been inappropriate to use the alternate *Squirt* methodology in a case where the plaintiff claims to have a "strong" mark. *See Bjs Restaurants, Inc.*, TTAB Opposition No. 91241877, 2025 WL 698604, at *18 (TTAB Feb. 27, 2025) (explaining, "given Opposer's contention that its BJ'S mark is 'famous,

commercially strong, and conceptually strong,' it was inappropriate for [the expert] to choose a Squirt-type survey" and *Eveready* "has often been called the "model" or "gold standard" of surveys in likelihood of confusion cases."). A finding the survey is "not relevant" when it showed no confusion - even when the court found BANDIT is "moderately strong commercially"—is therefore inconsistent and contrary to survey practice and precedent.

To the extent the District Court acknowledged "the Eveready methodology is appropriate when the mark has 'some level of commercial strength'" but then concluded *Eveready* is inappropriate here because "[Roar] argues the BANDIT Mark is both conceptually and commercially weak, undermining the relevance of its own survey methodology," 1-ER-34, courts have rejected such a restriction on use of an *Eveready* survey only in cases where the senior mark is well-known, widely recognized, or "top-of-mind." *See* 5 McCarthy on Trademarks and Unfair Competition § 32:174 and cases cited therein, e.g., *Limited v. Macy's Merchandising Group Inc*, No. 15-CV-3645 KMW, 2016 WL 4094913, at *10 (S.D. N.Y. 2016), aff'd, 695 Fed. Appx. 633 (2d Cir. 2007) (Rejecting plaintiff's argument that defendant's Eveready format was "inappropriate where a mark is not widely known or recognized" and should be used "only when the senior mark has 'top-of-mind' awareness." No likelihood of confusion was found.); *WIZKIDS/NECA, LLC v. TIII Ventures, LLC*, No. 17-CV-2400 (RA), 2019 WL

1454666, at *12 (S.D. N.Y. 2019) (Defendant submitted an Eveready-type survey to prove a lack of likelihood of confusion and plaintiff challenged it because its mark was not "top-of-mind." "But [plaintiff] cites no case and the court has found none, in which an Ever-ready survey was excluded on the grounds that the mark being tested was not so strong as to be considered a 'top-of-mind' mark." Granted summary dismissal of the infringement claim.); *C.V. v. Casa Azul Spirits, LLC*, No. H-22-2972, 2023 WL 7284182, at *6 (S.D. Tex. 2023) (Denied exclusion of *Eveready* type survey, rejecting the argument that survey should be excluded because the senior user's mark was not "top of the mind." "This argument goes to the weight of the evidence, not the admissibility.") later proceedings 2024 WL 1622638, *10 ((S.D. Tex. 2024) (Judgment of no infringement. Defendant's *Eveready* type survey was found reliable.).

Last, the District Court erred in finding the lack of actual confusion, as shown in the *Sartore* survey, is "not enough to raise a genuine issue of material fact precluding summary judgment." However, when there is a battle of the experts over critically important survey evidence, the District Court should not have resolved the dispute on summary judgment. Moreover, the lack of actual confusion tips the balance of this factor in Roar's favor. *See Gillette Canada Inc. v. Ranir Corp.*, 23 USPQ2d at * 6.

Accordingly, the *Sartore* survey is highly relevant to show no actual confusion in a controlled survey environment, which is highly relevant to show no likelihood of confusion. This is further supported by the lack of actual confusion despite the parties' coexistence in the marketplace for at least 3 years and heavy marketing and sales under both marks. A finder of fact could have (and should have) found that the absence of actual confusion is probative of no likelihood of confusion, and that this *Sleekcraft* factor weighs in Roar's favor. At a minimum, genuine disputes of fact exist which should have precluded summary judgment.

### E. Whether the Absence of Bad Faith Intent in Selecting the Mark is Probative of No Likelihood of Confusion

Another *Sleekcraft* factor assesses the defendant's intent in selecting the mark. The District Court found this fact "neutral" because it is not commonly assessed in opposition proceedings. *See* 1-ER-38–39. This is unsurprising because the *Sleekcraft* test is used in *infringement* proceedings in the Ninth Circuit, not in TTAB oppositions. In opposition proceedings, the Board applies the *DuPont* factors, which are similar to the *Sleekcraft* factors but do not expressly include an intent analysis.[15] Nevertheless, the defendant's intent is enumerated as a *Sleekcraft* factor and should be considered where there is evidence.

---

[15] In determining likelihood of confusion, the Board considers thirteen non-exclusive factors set forth in *In re E.I. DuPont DeNemours & Co.*, 177 USPQ 563, 567 (CCPA 1973): (1) The similarity or dissimilarity of the marks in their

Here there is no evidence of bad faith or suggesting Roar intended to select a purportedly similar mark. Roar adopted its mark in good faith with no knowledge of Sutter's BANDIT mark. 2-ER-48, ¶ 14. Sutter does not contend otherwise. This factor, which the Board did not consider and for which there is new evidence, weighs against a finding of a likelihood of confusion. Therefore, this factor should have been found to weigh in Roar's favor and not "neutral."

### F. Whether There is a Likelihood of Expansion, Which, if Absent, Weighs Against a Likelihood of Confusion

The last *Sleekcraft* factor assesses whether there is a likelihood of expansion of the parties' goods offerings. Roar introduced new evidence showing Sutter has no intent to expand into tequila, and Roar has no intent to expand into EL

---

entireties as to appearance, sound, connotation and commercial impression; (2) The similarity or dissimilarity and nature of the goods or services as described in an application or registration or in connection with which a prior mark is in use; (3) The similarity or dissimilarity of established, likely-to-continue trade channels; (4) The conditions under which and buyers to whom sales are made, i.e. "impulse" vs. careful, sophisticated purchasing; (5) The fame of the prior mark (sales, advertising, length of use); (6) The number and nature of similar marks in use on similar goods; (7) The nature and extent of any actual confusion; (8) The length of time during and conditions under which there has been concurrent use without evidence of actual confusion; (9) The variety of goods on which a mark is or is not used; (10) The market interface between applicant and the owner of a prior mark; (11) The extent to which applicant has a right to exclude others from use of its mark on its goods; (12) The extent of potential confusion i.e., whether *de minimis* or substantial; (13) Any other established fact probative of the effect of use.

BANDIDO YANKEE wine, which weighs against a finding of a likelihood of confusion. 1-ER-39.

The District Court found Roar's evidence was insufficient to show expansion was unlikely and suggested Sutter *could* expand into tequila based on the broad scope of the goods identification in the BANDIT registration. *See* 1-ER-39 ("[Sutter], as the owner of the BANDIT Registration, is entitled to use its mark on "alcoholic beverages except beer," which necessarily includes tequila").

Roar submits for the purposes of assessing this factor, the District Court should have considered the products in the marketplace (tequila vs. boxed wine) without relying on the broad scope of "alcoholic beverages, except beer" in the registration. **Consumers are not aware of the broad scope of the goods as set forth in the registration, and the District Court's suggestion that Sutter is "entitled" to expand use of BANDIT to other alcoholic beverages does not establish a "*likelihood* of expansion" as contemplated in *Sleekcraft*.**

Moreover, as noted above, the *Sleekcraft* factors are applied in infringement litigation within the Ninth Circuit, whereas the TTAB applies the *DuPont* factors in opposition proceedings, and *DuPont* does not expressly include a "likelihood of expansion" analysis. Unsurprisingly, therefore, the District Court did not cite authority requiring application of the "likelihood of expansion" factor to *the goods in the registration* as opposed to the actual goods (tequila vs. boxed wine).

Rather, in assessing this factor, the District Court relied solely on *Tuxedo Monopoly, Inc. v. Gen. Mills Fun Grp., Inc.*, 648 F.2d 1335, 1337 (CCPA 1981) for the proposition that "[l]ack of present intent to expand use of one's mark is not an overriding consideration," 1-ER-39. But nothing in *Tuxedo Monopoly* or *Sleekcraft* suggests the goods must be compared as shown in the registration (as opposed to the market reality) for purposes of assessing a "likelihood of expansion."

Simply put, *Sleekcraft* requires an assessment of the "likelihood of expansion" if there is evidence bearing on this factor. Here the record shows Sutter has no intent to expand into tequila, which weighs *against* a likelihood of confusion. Even if the absence of a likelihood of expansion is "not an overriding consideration," this factor still tips in favor of Roar and is not neutral. At a minimum, the factual dispute on this issue alone should preclude summary judgment. *Fortune Dynamic, Inc.*, 618 F.3d at 1031 (reversing summary judgment finding genuine issue of material fact as to likelihood of expansion).

## G. Whether There is a Likelihood of Confusion, Balancing the Factors

Balancing all of the *Sleekcraft* factors, the District Court ultimately found "the first, second, third, fifth and sixth Sleekcraft factors—strength of [Sutter's] mark, proximity of the goods, marketing channels, similarity of the marks, and degree of care likely to be exercised by the consumer—weigh in favor of finding a

likelihood of confusion, and the fourth, seventh and eighth Sleekcraft factors—evidence of actual confusion, intent, and likelihood of expansion—are neutral." 1-ER-39-40.

Roar submits the District Court balanced the *Sleekcraft* factors improperly, which constitutes reversible error. *Fortune Dynamic, Inc.*, 618 F.3d 1025 ("[l]ikelihood of confusion is a factual determination," and "district courts should grant summary judgment motions regarding the likelihood of confusion sparingly" . . . . Granting summary judgment in cases in which a majority of the *Sleekcraft* factors could tip in either direction is inconsistent with that principle. Because "a jury could reasonably conclude that most of the [Sleekcraft] factors weigh in [Fortune's] favor . . . the district court erred in granting Victoria's Secret's motion for summary judgment on the question of likelihood of confusion.").

The marks "EL BANDIDO YANKEE" and "BANDIT" are so different that the key factor of the dissimilarity of the marks is dispositive. *See, e.g., Kellogg Co. v. Pack'em Enters.*, 951 F.2d 330, 332–33 (Fed.Cir.1991) (stating that "[w]e know of no reason why, in a particular case, a single DuPont factor may not be dispositive" and holding that "substantial and undisputed differences" between FROOTEE ICE and elephant design and FRUIT LOOPS justified a conclusion of no likelihood of confusion on summary judgment); *Keebler Co. v. Murray Bakery Prods.*, 866 F.2d 1386, 1388 (Fed.Cir.1989) (agreeing with the Board that the

"more important fact for resolving the issue of likelihood of confusion ... is the dissimilarity in commercial impression between the marks"); *Sears Mortg. Corp. v. Ne. Sav. F.A.*, 24 USPQ2d 1227 (TTAB 1992) dissimilarity between the marks APPROVAL PLUS and APPROVALFIRST dispositive).

In addition, many of the other factors weigh in favor of a finding of no likelihood of confusion, including: the weakness of the BANDIT mark due to extensive third-party use and registration of similar BANDIT formatives; the lack of actual confusion as demonstrated by survey evidence and the coexistence of the brands in the marketplace for years without confusion despite heavy marketing; the different degree of care consumers exercise when purchasing expensive tequila and low cost wine; Roar's intention to adopt its mark in good faith; and no likelihood of the parties' expansion into each other's line of products. **Thus, the first, third, fourth, sixth, seventh, and eighth *Sleekcraft* factors weigh in favor of Roar.**[16]

Importantly, the three factors of no actual confusion, Roar's intent in selecting its mark, and no likelihood of expansion were not before the Board. New evidence on these factors tips the balance in Roar's favor. A fact finder may conclude these additional factors – together with the clear differences between the marks – compels a finding of no likelihood of confusion.

[16] In this appeal, Roar does not challenge the findings on the second and fifth factors of the "proximity or relatedness of the goods" and "marketing channels."

Instead of identifying whether genuine issues of material fact remained for trial, the District Court improperly resolved disputes on these highly subjective questions of fact. These questions are best left for determination after weighing the full evidentiary record at trial. *Fortune Dynamic, Inc.*, 618 F.3d at 1031 (question of likelihood of confusion "should be answered as a matter of fact by a jury, not as a matter of law by a court.").

## VII.

## CONCLUSION

For the reasons set forth above, Roar respectfully requests that the Court of Appeals reverse the District Court's grant of summary judgment in favor of Sutter and remand this case for further proceedings and a bench trial on a *de novo* review of the question of whether there is a likelihood of confusion.

DATED: June 23, 2025

WOLF, RIFKIN, SHAPIRO,
SCHULMAN & RABKIN, LLP

By: */s/ Paulo A. de Almeida*
Paulo A. de Almeida
Robert A. Rivas
Eric A. Westlund
Benjamin J. Mandel

Attorneys for Appellant, ROAR SPIRITS, LLC
f/k/a EL BANDIDO YANKEE, LLC

## STATEMENT OF RELATED CASES

Pursuant to Ninth Circuit Rule 28-2.6, Appellant ROAR SPIRITS, LLC f/k/a EL BANDIDO YANKEE, LLC and its counsel are unaware of any related case within the meaning of the rule.

DATED: June 23, 2025

WOLF, RIFKIN, SHAPIRO,
SCHULMAN & RABKIN, LLP

By: */s/ Paulo A. de Almeida*
Paulo A. de Almeida
Robert A. Rivas
Eric A. Westlund
Benjamin J. Mandel

Attorneys for Appellant, ROAR SPIRITS, LLC
f/k/a EL BANDIDO YANKEE, LLC

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** 25-2301

I am the attorney or self-represented party.

**This brief contains** 11,726 **words,** including 0 words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

- [x] complies with the word limit of Cir. R. 32-1.
- [ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.
- [ ] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).
- [ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.
- [ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
  - [ ] it is a joint brief submitted by separately represented parties.
  - [ ] a party or parties are filing a single brief in response to multiple briefs.
  - [ ] a party or parties are filing a single brief in response to a longer joint brief.
- [ ] complies with the length limit designated by court order dated ______.
- [ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** /s/ Paulo A. de Almeida **Date** June 23, 2025

*(use "s/[typed name]" to sign electronically-filed documents)*

# CERTIFICATE OF SERVICE

At the time of service, I was over 18 years of age and **not a party to this action**. I am employed in the County of Los Angeles, State of California. My business address is 11400 West Olympic Boulevard, 9th Floor, Los Angeles, CA 90064-1582.

On June 23, 2025, I served true copies of the following document(s) described as **APPELLANT'S OPENING BRIEF** on the interested parties in this action as follows:

See attached Service List

**BY CM/ECF NOTICE OF ELECTRONIC FILING:** I electronically filed the document(s) with the Clerk of the Court by using the CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the CM/ECF system. Participants in the case who are not registered CM/ECF users will be served by mail or by other means permitted by the court rules.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

Executed on June 23, 2025, at Los Angeles, California.

Jean Lee

Jean Lee

**SERVICE LIST**
**Roar Spirits, LLC v. Sutter Home Winery, Inc.**
**9th Circuit Court of Appeals, Appeal No. 25-2301**

E-FILING PARTY
Robert A. Rivas, Esq.
Paulo A. de Almeida, Esq.
Eric A. Westlund, Esq.
Benjamin J. Mandel, Esq.
**WOLF, RIFKIN, SHAPIRO, SCHULMAN & RABKIN, LLP**
11400 West Olympic Blvd., 9th Floor
Los Angeles, California 90064-1582
Telephone: (310) 478-4100
Facsimile: (310) 479-1422
rrivas@wrslawyers.com
pdealmeida@wrslawyers.com
ewestlund@wrslawyers.com
bmandel@wrslawyers.com

*Attorneys for Plaintiff/Appellant*
ROAR SPIRITS, LLC, a Delaware limited liability company, f/k/a EL BANDIDO YANKEE, LLC

BY APPELLATE CM/ECF
J. Scott Gerien, Esq.
Joy L. Durand, Esq.
Allison N. Berk, Esq.
**DICKENSON, PEATMAN & FOGARTY**
1500 First Street, Suite 200
Napa, California 94559
Telephone: (707) 261-7000
Facsimile: (707) 340-7239
sgerien@dpf-law.com
jdurand@dpf-law.com
aberk@dpf-law.com

*Attorneys for Defendant/Appellee*
SUTTER HOME WINERY, INC., a California corporation